IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  20-cv-01052-RM-NRN

RAVERRO STINNETT,

Plaintiff,

v.

REGIONAL TRANSPORTATION DISTRICT, a political subdivision of the State of Colorado;
UNIVERSAL PROTECTION SERVICE, LP, d/b/a ALLIED UNIVERSAL SECURITY SERVICES, a California corporation;
SERGEANT TAYLOR TAGGART, in his official capacity;
OFFICER JAMES HUNTER, in his official capacity;
OFFICER VICTOR DIAZ, in his official capacity;
OFFICER AARON FOUGERE, in his official capacity,

Defendants.

---

**ORDER DENYING MOTION FOR
CIVIL RESTRAINING (GAG) ORDER (DKT. #36)**

---

**N. REID NEUREITER
United State Magistrate Judge**

This matter comes before this court on Defendant Universal Protection Service, LP d/b/a Allied Universal Security Services' Motion for Civil Restraining (Gag) Order, Dkt. #36, filed on July 23, 2020 and referred to this Court by Judge Raymond P. Moore on July, 24, 2020. Dkt. #37. Plaintiff responded to the Motion on August 3, 2020, Dkt. #45, and the Court heard argument of the parties at a telephonic hearing on August 5, 2020. Dkt. #47. Defendant RTD took no position on the matter. The Court takes judicial notice of the file. Having reviewed the Motion and associated briefing and the applicable case law, the Court **DENIES** Defendant Allied's motion for a gag order that would limit

the ability of Plaintiff Raverro Stinnett and his attorneys to speak publicly and to the press about this matter and the underlying events.

## FACTUAL BACKGROUND

This case arises out of an incident that occurred on April 20, 2018. On that date, Plaintiff, Raverro Stinnett, was assaulted by RTD Transit Security Officers ("TSO") at Denver's Union Station. The Security Officers were employees of Allied, which has a security contract with RTD. Other RTD TSO's failed to intervene in the assault on Mr. Stinnett, and three TSOs subsequently entered guilty pleas after being criminally charged as a result of the attack. Mr. Stinnett, who is black, was knocked unconscious during the assault and is alleged to have suffered significant, permanent, traumatic brain injuries, as well as injuries to his face and jaw.

Mr. Stinnett asserts claims pursuant to 42 U.S.C. § 1983 against RTD for violations of his Fourth and Fourteenth Amendment rights, and for race-based discrimination in violation of 42 U.S.C. § 1981 against both RTD and Allied. Dkt. #1. Mr. Stinnett has also brought state law tort claims for negligent hiring, negligent supervision or retention, negligent training, and negligent failure to summon medical aid. *Id.* Mr. Stinnett's complaint alleges that, to this day, RTD continues to contract with Allied for RTD Transit Security Officers and continues to permit the hiring of TSOs with no law enforcement training or experience. *Id.* at 3.

Mr. Stinnett has created a website called "Justice for Raverro" publicizing what happened to him, describing his injuries, and decrying the renewal of Allied's $40 million security contract with RTD. Among other things, the Website features speakers demanding that RTD compensate Mr. Stinnett for his injuries and "Terminate all current and outstanding contracts with Allied Universal Security effective immediately." *See*

https://www.justiceforraverro.com/ (last visited August 5, 2020). In addition, Mr. Stinnett's attorneys have given interviews with radio and other news outlets publicizing their view of the anticipated facts of the case, including claims (based on Allied's alleged conduct in Boston) that Allied's security personnel specifically target homeless people and people of color for rough treatment.  Defendant Allied seeks a gag order that would prevent Mr. Raverro and his attorneys from publicly commenting to the press about this case.

## LEGAL STANDARD

As the Supreme Court has explained, "an attorney's duties do not begin inside the courtroom door." *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1043 (1991) (noting that in the criminal context, a defense attorney "may pursue lawful strategies . . . including an attempt to demonstrate in the court of public opinion that the client does not deserve to be tried"). Lawsuits, and in particular lawsuits of a constitutional dimension involving interactions between private citizens and government actors, frequently occur in a broader social context. There is a strong public interest in having a robust debate about such disputed interactions, and a party who claims to have been wronged by unconstitutional or otherwise tortious conduct by a government entity is free to try to obtain vindication by any number of means, including by using his or her First Amendment rights to educate the public, to try to bring public pressure on the defendants to effectuate a settlement, or even to educate the defendants to ensure that the wrongful conduct never happens to anyone else. In filing a lawsuit seeking justice in court, a litigant does not necessarily forsake his or her rights to use any of these First Amendment protected mechanisms, subject to certain limitations. *See Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 32-33, n.18 (1984) (explaining that "[a]lthough litigants do

3

not surrender their First Amendment rights at the courthouse door, . . . those rights may be subordinated to other interests that arise in [the litigation] setting") (citation and internal quotation marks and citation omitted).

In the context of a jury trial, "[t]he public has an overriding interest that justice be done in a controversy between the government and individuals and has the right to demand and expect 'fair trials designed to end in just judgments.'" *United States v. Tijerina*, 412 F.2d 661, 666 (10th Cir. 1969) (quoting *Wade v. Hunter*, 336 U.S. 684, 689 (1949) and *Mares v. United States*, 383 F.2d 805, 808-09 (10th Cir. 1967)). Thus, when one party seeks to gag another party or the other party's lawyers from speaking publicly about a case, the Court must balance the party's right to speak freely on issues of public importance with the need to conduct a jury trial untainted by inadmissible evidence or argument.

To obtain a gag order binding a trial participant from exercising First Amendment rights, the moving party has a heavy burden to bear. "[I]n any case involving pretrial publicity, the court must decide whether 'the gravity of the "evil," discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger.'" *Pfahler v. Swimm*, No. 07-cv-01885-MJW-KLM, 2008 WL 323244, at *1 (D. Colo. Feb. 4, 2008) at *2 (quoting *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 562 (1976)).

The extent of the moving party's burden is subject to dispute. This Court and the Tenth Circuit have held that a "party seeking to impose a gag order on any trial participant must show that there is a 'reasonable likelihood' that media attention or extrajudicial commentary will prejudice a fair trial." *Pfahler* at *1 (citing *United States v. Tijerina*, 412 F.2d 661, 666 (10th Cir. 1969)). *See also Tijerina*, 412 F.3d at 666

4

(affirming contempt citation for violating a gag order based on a reasonable likelihood of "prejudicial news which would make difficult the impaneling of an impartial jury and tend to prevent a fair trial."). But the Supreme Court of the United States in *Gentile v. State Bar of Nevada* (decided well after *Tijerina*), commented that a Nevada Supreme Court rule prohibiting a lawyer from making extrajudicial statements was constitutional where the lawyer knows or reasonably should know that the statements have a "*substantial likelihood* of materially prejudicing" the adjudicative proceedings. *Gentile*, 501 U.S. 1030, 1063 (1991) (emphasis added). In *Gentile*, the discipline imposed on criminal defense attorney Gentile for making public comments six months before the empanelment of a criminal jury was overturned for vagueness in the application of the "substantial likelihood" test.

I believe "substantial likelihood" outlined by the Supreme Court in *Gentile* is a higher standard than the "reasonable likelihood" standard articulated by the Tenth Circuit in *Tijerina*. *See Gentile*, 501 U.S. at 1037 (plurality opinion of Justice Kennedy, opining that drafters of Model Rule 3.6 "apparently thought the substantial likelihood of material prejudice formulation approximated the clear and present danger test"). I find that to meet constitutional muster, any so-called gag order barring extrajudicial statements must be justified by a <u>substantial likelihood of material prejudice</u> to the judicial proceeding.

In determining whether the substantial likelihood of prejudice exists, and whether a gag order is appropriate, a court should consider (1) "the nature and extent of pretrial news coverage"; (2) "whether other measures would be unlikely to mitigate the effects of pretrial publicity"; and (3) "how effectively a restraining order would operate to prevent the threatened danger." *Nebraska Press Ass'n*, 427 U.S. at 562. The court "must then

5

consider whether the record supports the entry of a prior restraint on publication, one of the most extraordinary remedies known to our jurisprudence." *Id.*

## ANALYSIS

Allied admits that the attack on Mr. Stinnett by its security employees was both criminal and brutal, but maintains that that the attackers were acting outside the course and scope of their employment, and that, contrary to Plaintiff's allegations, the attack was an isolated incident that cannot be attributed to Allied. Allied contends that repeated statements made by Mr. Stinnett and his attorneys to the effect that the assault is indicative of systematic targeting of homeless and people of color "to state-wide Colorado news sources . . . will assuredly taint the jury pool and make it impossible to seat an unbiased jury for trial." Dkt. #36 at 1-2. Other than argument and conclusory statements, Allied presents no actual evidence that this is true. Such evidence might include a survey of Colorado residents likely to be in the jury pool to determine whether they have heard of Mr. Stinnett or the incident. But nothing of this sort was presented for this Court's consideration.

Plaintiff counters that Allied's position requires to Court accept Allied's assertions that the attack on Mr. Stinnett was "isolated" and that there is no evidence that RTD and Allied systematically targeted homeless and communities of color. Plaintiff argues that there is substantial evidence that Allied and RTD have been accused of targeting homeless people, who are disproportionately racial minorities, and not just in Denver. Mr. Stinnett specifically points to a news article from the *Boston Globe* in 2017 in which former Allied security guards reported being told by Allied management to eject homeless people. Dkt. #45-2. Thus, Plaintiff argues, the statements by Mr. Stinnett and his counsel to the press in Colorado are well supported by evidence. Plaintiff also

6

argues that there are broader issues at stake than just the outcome of this lawsuit. Allied has a contract with RTD (a public entity) that is up for renewal. Mr. Stinnett is entitled to voice publicly his strong opinion that, based on his experience with Allied's employees, for the greater good of the people of Denver, the contract should be terminated immediately and not be renewed.

Plaintiff further argues that Allied presents no evidence that the press coverage will result in any prejudice at trial, and that considering the limited amount of press coverage, the large jury pool, length of time until jury selection, and the availability of *voir dire* and appropriate jury instructions, there is no basis for a gag order which would infringe Mr. Stinnett's (or his lawyers') First Amendment rights.

### 1.   *Pretrial News Coverage*

Allied points to four separate reports by news outlets between April and July 2020, including two reports in the *Denver Post*, a story on the local CBS news website which includes footage, as well as a story on Colorado Public Radio, to support its argument that the news coverage is "widespread" and "extremely prejudicial." Allied argues that Plaintiff and his counsel have regularly appeared in Colorado news outlets where they have repeatedly discussed the incident, this lawsuit, and have made "multiple statements notwithstanding the known disputed facts." Dkt. #36 at 4.

Mr. Stinnett responds that the four media reports cited by Allied are evidence of nothing more than insubstantial press coverage that would not significantly impair the fairness of a trial. The Court agrees. As Mr. Stinnett points out, the size of the jury pool, as well as the length of time before trial, which has not been set yet, means the risk of prejudice is low. *See Gentile*, 501 U.S. at 1044 (where jury would not be empaneled for another six months at the earliest, attorney reasonably concluded that innocuous

7

statement to press "was not substantially likely to result in material prejudice"). *See also Slivka v. Young Men's Christian Ass'n of Pikes Peak Region*, 390 F.Supp.3d 1283, 1286 (D. Colo. 2019) (finding "the extent of pretrial news coverage" was "insubstantial" where "three media sources have published articles related to the lawsuit").

If the case is tried in Denver, the jury pool will consist of jurors from Jury Division 1. Jury Division 1 consists of twenty-four counties: Adams, Arapahoe, Boulder, Broomfield, Chaffee, Clear Creek, Denver, Douglas, Elbert, Gilpin, Grand, Jackson, Jefferson, Lake, Larimer, Logan, Morgan, Park, Phillips, Sedgwick, Summit, Washington, Weld, and Yuma Counties. *See* The United States District Court, District of Colorado, Jury Frequently Asked Questions (FAQs), http://www.cod.uscourts.gov/JurorInformation/JuryFAQs.aspx#14 (last visited August 5, 2020). The area covered by Jury Division 1 is enormous and the coverage and interest in this incident in the outer-lying counties is not likely to be so great as to influence potential jurors. Indeed, based on the evidence presented, it is hard to even characterize the coverage in Denver and the immediately surrounding counties as pervasive. Like in *Slivka*, the press coverage has been nothing more than insubstantial. *See* 390 F.Supp.3d at 1287 (denying request for gag order where Defendant failed to show that members of the jury pool were exposed to news article or had formed negative impressions of the Defendant as a result).

And in the present matter, even if there were evidence of pervasive media coverage, there has been no showing that a thorough *voir dire* would not be adequate to address the problem. As the Supreme Court explained in the infamous Enron corporate fraud case, which was tried in Enron's home town of Houston, Texas, where thousands lost jobs after the Enron bankruptcy, "'pretrial publicity—even pervasive,

8

adverse publicity—does not inevitably lead to an unfair trial.'" *Skilling v. United States*, 561 U.S. 358, 384 (2010) (*quoting Nebraska Press,* 427 U.S. at 554) (affirming trial court's refusal to change venue even in the face of wide adverse publicity where, in light of Houston's large population and diverse jury pool, "the suggestion that 12 impartial individuals could not be empaneled is hard to sustain"). The news coverage of this case has not been pervasive or constant. The Court concludes that this factor weighs against finding that a gag order is necessary.

### 2. *Other Available Measures to Mitigate*

Allied seeks a broad restraining order, and maintains that there are no other adequate measures to mitigate the effects of the news stories, arguing that the news stories were published "on state-wide news sources" capable of reaching jurors from across the entire state. Dkt. #36 p. 6. As Plaintiff points out, Allied in its pleadings fails to explain why other available measures, such as *voir dire* and carefully crafted jury instructions, would not be adequate to address any adverse pretrial publicity. *See United States v. McVeigh*, 955 F. Supp. 1281, 1283 (D. Colo. 1997) (finding "extensive *voir dire*" of potential jurors is sufficient to ensure that a "fair minded jury" could be empaneled even in a case involving overwhelming amounts of highly prejudicial pretrial publicity reporting the blowing up of the Oklahoma City federal building and 168 deaths). *See also Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991) (potential for prejudice in widely publicized murder case mitigated by the size of the "metropolitan Washington [D.C.] statistical area, which has a population of over 3 million, and in which, unfortunately, hundreds of murders are committed each year"); *Gentile*, 501 U.S. at 1030 (noting the reduced likelihood of material prejudice to proceedings from pretrial statements where venire was drawn from a pool of over 600,000 individuals).

Allied failed to meet its burden with respect to this factor, and the Court concludes that it too weighs against issuing a gag order.

### 3. *Effectiveness*

Defendants argue that a restraining order would "force" counsel for Plaintiff to comply with Colorado Rule of Professional Conduct 3.6, which prohibits extrajudicial statements to the press which have a "substantial likelihood of materially prejudicing" a trial in this case. However, Allied does not demonstrate that any of the statements made by Plaintiff or his counsel do in fact have a substantial likelihood of materially prejudicing these proceedings. The discovery cut-off in this case is April 15, 2021. The Dispositive Motion deadline is May 17, 2021 and the final pretrial conference is set for July 13, 2021, nearly a year from now. Per normal practice, the trial date likely will not be set until the final pretrial order is entered. Given the average time from filing to trial in this District (in excess of two years on average), coupled with the delays in this Court's trial dockets due to the COVID-19 pandemic, the trial is not happening any time soon. Any articles or interviews published this year, or even into early next year, likely will be long forgotten by the time the case gets to trial. Circumstances might be different if Plaintiff's counsel were giving extensive interviews to radio or newspapers on the eve of trial. But we have not reached that point. As the Supreme Court explained in *Gentile*, 501 U.S. at 1044:

> A statement which reaches the attention of the venire on the eve of *voir dire* might require a continuance or cause difficulties in securing an impartial jury, and at the very least could complicate the jury selection process. . . [while] exposure to the same statement made six months prior to trial would not result in prejudice, the content fading from memory long before the trial date.

10

In this case, we are many months, not weeks, before any trial in this case. *See Skilling*, 561 U.S. at 383 (explaining that "unlike cases in which trial swiftly followed a widely reported" event, years elapsed between Enron's bankruptcy and Skilling's criminal trial, leading to a "diminished level of media attention"). Based on the evidence presented, there is no substantial likelihood that any statements made by either the Plaintiff or his attorneys would materially prejudice the trial in this case. Defendant Allied has not even met the lesser burden of showing a "reasonable likelihood" of material prejudice to the trial.

The Court accordingly finds that a gag order is not warranted.

## CONCLUSION

Defendant Universal Protection Service, LP s/b/a Allied Universal Security Services' Motion for Civil Restraining (Gag) Order (Dkt. #36) is **DENIED**.

Date: August 7, 2020.                                    By the Court:

N. Reid Neureiter
United States Magistrate Judge